IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

_____
                               )
UNITED STATES OF AMERICA,       )
                               )
        Plaintiff,              )
                               )
v.                             )   Case No.:  8:25-CR-76
                               )
SANJAR JAMILOV,                 )
                               )
        Defendant.              )
_____)


**SENTENCING PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS P. BARBER**
**UNITED STATES DISTRICT JUDGE**

**July 31, 2025**
**10:50 a.m. to 11:00 a.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**          DANIEL J. MARCET, ESQUIRE
                                Office of the United States Attorney
                                400 North Tampa Street
                                Suite 3200
                                Tampa, Florida 33602

**FOR THE DEFENDANT:**          DAVID L. HAAS, ESQUIRE
                                Haas Law, PLLC
                                201 South Orange Avenue
                                Suite 1017
                                Orlando, Florida 32801

**ALSO PRESENT:**               SANJAR JAMILOV, DEFENDANT

(Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

(Call to Order of the Court at 10:50 a.m.)

**THE COURT:** Come on down. Let's do this thing. 25-CR-76.

(The defendant is sworn.)

**THE COURT:** You speak English?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Say your name.

**MR. HAAS:** David Haas on behalf of Mr. Jamilov.

**MR. MARCET:** Daniel Marcet on behalf of the United States.

**THE COURT:** Okay. So this might get the award for the most interesting case on my docket right now.

**MR. MARCET:** We aim to please, Judge.

**THE COURT:** What was that?

**MR. MARCET:** We aim to please.

**THE COURT:** You know, you're replacing the migratory bird cases, so I don't know if that's a pretty high bar. But I think there's more to this case. Maybe not.

But on April 24th, 2025, the defendant pled guilty to Count 1 of a federal indictment, charging conspiracy to commit voter registration fraud, in violation of federal law.

I adjudicated him guilty, accepted his plea. Here we are for the sentencing. Does anybody have any objection to the Guideline calculations or presentence report?

**MR. MARCET:** No, Your Honor.

**MR. HAAS:**  No, Your Honor.

**THE COURT:**  All right.  This presentence report, it's written all about you.  It tells me all about Uzbekistan and all this other stuff.

Did you read it?

**THE DEFENDANT:**  Yes.

**THE COURT:**  Did you go over it with your lawyer?

**THE DEFENDANT:**  Yes, Your Honor.

**THE COURT:**  Any questions for him or me about anything in it?

**THE DEFENDANT:**  No questions.

**THE COURT:**  All right.  So under the Federal Sentencing Guidelines, total offense level eight, criminal history category I, the Guidelines are what, up to six months?  Is this a misdemeanor or something?

**MR. MARCET:**  It's a felony, Judge.  We did have a -- the eight is with our 5K.  Correct.

**MR. HAAS:**  No, not yet.

**MR. MARCET:**  We had a two-level motion for reduction based on his cooperation.

**THE COURT:**  So then it goes from an eight to a six?

**MR. MARCET:**  Correct.

**THE PROBATION OFFICER:**  Correct, Your Honor.

**THE COURT:**  All right.  And then his range is what to what?

**MR. MARCET:**  Still up to six months.

**THE COURT:**  Still up to six months.  One to three years' supervised release.  He's in jail now.  Restitution is not applicable, possible fine of 2,000 to 20,000, and a hundred-dollar special assessment.

What's going on?

**MR. MARCET:**  Judge, I mean, I'll cut to the chase.  We're asking for time served.  I'll explain to you what's going on.  So this is a conspiracy led by Dmitry Shushlebin, who just pled guilty, the lead defendant.  What he was doing was trying to create fake people for the purpose of committing financial fraud.

So what he would do was, take a name, date of birth, Social Security number, and then try to go through a variety of steps to make it appear to banks and other financial institutions that these completely made-up people and fake Social Security numbers were in fact real people.

This, as you can imagine, is labor intensive.  So you're taking one, two, three, four, five, six, seven, eight, nine John Smiths with a fake date of birth, and I'm just applying for credit cards, I'm applying for bank accounts, knowing I'm getting rejected.  But knowing that every time I get rejected, I'm creating a credit history, and that the credit agencies and the banks are not independently verifying my Social Security number.

So just by virtue of existing in the credit system, these fake people would come to have credit scores.  Those credit scores would slowly go up.  They'd be able to get different accounts.  Through very sophisticated financial mechanisms, Shushlebin would create bank accounts.  He would add them as authorized users on credit cards, build their credit scores.

In January 2023, he hired the defendant's girlfriend.  In furtherance of this scheme, he lied to the defendant's girlfriend about what the purpose of her job was.  She thought -- she was told it was a legitimate office job.  What he was really doing was using her to impersonate employees at his fake businesses.

From there, he hired Mr. Jamilov to take over, with his girlfriend, the job of submitting all these fake things to credit card companies and banks to make these fake people seem real.

**THE COURT:**  What were the fake people ultimately going to be doing?  Stealing money?

**MR. MARCET:**  Yes.  That's where I'm getting.

**THE COURT:**  Okay.

**MR. MARCET:**  So Mr. Jamilov, this is what he told us, this is what his girlfriend told us, and this is what Mr. Shushlebin confirmed.  He was also misled.  He was told that these were real people who hired Mr. Shushlebin's business to build their credit scores.  And so that's why they were

doing this, all of this activity.

Mr. Jamilov worked for him for a few months to build up these fake people.  In the course of that, one of the things that Shushlebin had Jamilov and his girlfriend do was submit fake voter-registration applications.  These applications, they were real voter-registration applications for these fake people.

The reason being, that voter registration is very sticky in the Florida's public records.  And so if they were able to register these people to vote, they would, again, be further credence these were real people.

And then once Mr. Jamilov left the conspiracy over a falling out with Shushlebin, Shushlebin then used these fake people to -- and his fake businesses in conjunction to obtain loans over a million dollars' worth for dental services, auto repairs, all types of things.

So he'd open up a dental company using a dentist's stolen identity.  He'd then claim one of these fake people came in to get a root canal, couldn't afford it, needed a loan. He'd then get the loan and never pay it.  He did that to the tune of something like $1.1 million.

**THE COURT:**  Wow.  You got that far with it before getting caught, that amount of money.

**MR. MARCET:**  I think he submitted requests for 1.1 million.  I think he got paid like 750,000 or something.

**THE COURT:** Still pretty good.

**MR. MARCET:** Over the course of several years. But anyway, so that's all to say there is a lot more going on here. Mr. Jamilov's role was very limited. He didn't have a full understanding of the scope. He immediately came in before seeing any discovery and told us everything he knew. He's been entirely truthful with us, as far as we know.

And I do think if this was a case where they were submitting 132 voter registrations with the intent to vote, zero to six months would not be anywhere near the appropriate Guidelines range. There's no indication that Mr. Jamilov had any intent to do anything other than try to create this record of these people.

Again, he's been completely cooperative. His remuneration in this was very minimal. He had no knowledge of the broader part of the fraud scheme, as far as we can prove. And so I do think that the zero-to-six range, given the mitigating circumstances here and his cooperation, is appropriate.

**THE COURT:** I've got to tell you, I'm extremely disappointed, extremely disappointed, because I thought voter registration in Pinellas County, Uzbekistan, I thought this was going to have something to do with some of the other cases you've been involved in. I told my intern, look at this.

**MR. MARCET:** So did I.

THE COURT:  It's going to be involved with the KGB. It's going to be really --

MR. MARCET:  I promise you, I ran that all to the ground.  When we first -- this was -- we were brought in very late in this case, because the state had been running with it for a year, and they just couldn't make heads or tails of it. When I looked at this, that's what I thought this was.  I can tell you, we've exhausted every angle of that.

THE COURT:  That makes me feel better, because I just told the intern this is going to be related to this international espionage stuff and everything, and this guy pretended to be on a Carnival Cruise Line is really a KGB agent willing to go down, spend some time in jail for the -- you know, the motherland and all this other stuff.  And turns out, didn't work that way.  All right.

MR. MARCET:  Sorry to disappoint you, Judge.

THE COURT:  Yeah, I know.  I'll give you time served on this.  You don't have to say anything.  But if you want to, you have the right to say anything you want to say.

Why is he still in jail?  Because he's getting deported anyway?  Is that the idea?

MR. HAAS:  He is, Your Honor.  And kudos to the government.  We've got his passport with his girlfriend, so the hope is that he's going to get turned back to Uzbekistan.

THE COURT:  Don't come back.  You know what happens

if you come back?  You know where you're going to end up?

El Salvador.  I'm serious about that.  They're deporting people

to El Salvador and Africa, so don't come back.

**MR. HAAS:**  He knows.

**MR. MARCET:**  He is going to be deposed at 3:00 today,

so marshals should not immediately --

**THE COURT:**  All right.  Marshals, he needs to be

deposed.

**MR. MARCET:**  For a hearing at 3:00 today.  I've

communicated with the marshals, but just so --

**MR. HAAS:**  Don't take him right away.

**MR. MARCET:**  Don't let him go right now.

**THE COURT:**  You want to say anything?  Anybody want

to say anything?

**THE DEFENDANT:**  Yeah.  First of all, thanks so much

for letting me to speak.  I would like to sincerely apologize

for all the trouble that I caused for this country and to the

people.

And for the last six months being in jail, I went

through all the things that I did.  I realized what I got

myself into.  And by keeping in mind, in my mind, what I was

told about this job, I was just ignoring my common sense.

And I came to this country three years ago to make my

life better.  But right now, instead, I'm here.  And I'm not

blaming anybody for what happened to me, except me, myself.  I

take full responsibility for that.

But what happened is in the past, and one thing I must do is learn from my mistakes and the wrong decisions, and keep moving forward by being and acting honestly, righteously, and godly.

Thank you so much.

**THE COURT:** Okay. Well, having heard from everyone, I'm accepting the plea agreement, because I'm satisfied it adequately reflects the seriousness of the offense. Under the plea agreement, he's pled guilty to Count 1 in return for dismissing Count 2, 3, 4, and 5. So those are dismissed.

If you want to appeal, plea agreements don't usually let you do that. But if you want to try it, you've got to do it in 14 days or you lose your right to appeal. You can get a free lawyer, and they'll take your appeal for free without charging you a filing fee at the clerk's office, if you wanted to appeal.

I'm not going to fine you.

Is there anything to forfeit here?

**MR. MARCET:** No.

**THE COURT:** All right. He has to pay a hundred-dollar special assessment, which is due immediately. I'm not going to fine him. He's been in jail for how long?

**MR. HAAS:** About six months, Your Honor.

**THE COURT:** Okay. He doesn't need any supervision.

If you're deported, do not come back without the appropriate authority's permission, which they're probably not going to give you, so don't try it.

And this sentence, after everything we've discussed here, is sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing.

Had he been involved in some sort of international espionage, I would probably be sentencing him to a much more severe sentence, but that doesn't appear to be the case.  So good luck.

**THE DEFENDANT:**  Thank you so much, Your Honor.

**MR. HAAS:**  Thank you, Your Honor.

(Proceedings adjourned at 11:01 a.m.)

UNITED STATES DISTRICT COURT

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Rebekah M. Lockwood, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings; and that the foregoing pages constitute a true and complete computer-aided transcription of my original stenographic notes to the best of my knowledge, skill, and ability.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand at Tampa, Hillsborough County, Florida, this 27th day of August 2025.

REBEKAH M. LOCKWOOD, RDR, CRR
Official Court Reporter
United States District Court
Middle District of Florida