UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | Criminal No. 8:25-cr-00076-TPB-AAS |
| DMITRY SHUSHLEBIN<br>Defendant | ) | |

**DEFENDANT DMITRY SHUSHLEBIN'S SENTENCING MEMORANDUM**

Defendant Dmitry Shushlebin, by and through undersigned counsel, respectfully requests that this Honorable Court impose a total sentence of thirty months' imprisonment: six months on the wire fraud count, followed by the mandatory consecutive twenty-four-month sentence on the aggravated identity theft count. That sentence would constitute a serious and substantial punishment while satisfying the statutory command that this Honorable Court impose a sentence "sufficient, but not greater than necessary" to accomplish the purposes of sentencing.

Before this case, Mr. Shushlebin had no adult convictions, pending charges, or other arrests. He is highly educated, has worked throughout his adult life, and has substantial family responsibilities, including an elderly mother in declining health who lives alone in Russia and for whom he is the only child and principal source of support. He also faces the likelihood of deportation and the loss of the life he spent more than a decade building in the United States.

Those immigration consequences also make the same nominal sentence more punitive for Mr. Shushlebin than for an otherwise comparable United States citizen. Once he is subject to a final order of removal, he will be statutorily ineligible to apply First Step Act earned time credits toward prerelease custody or supervised release. Thus, even if Mr. Shushlebin successfully completes the same recidivism reduction programs as a similarly situated citizen, he will remain incarcerated for a longer period because he cannot apply those credits to obtain an earlier transfer from prison. This practical disparity should be considered in determining the sentence necessary to provide just punishment without imposing punishment greater than necessary.

Mr. Shushlebin's conduct while incarcerated provides additional evidence relevant to the sentence necessary to protect the public and deter future misconduct. He has received no disciplinary reports, has treated correctional staff respectfully, has supported other detainees, has regularly attended chapel, and has been described by institutional personnel as a mentor who is willing to learn and help others. Those observations are consistent with the many letters submitted by family members, friends, community members, and former colleagues describing a person capable of rehabilitation and supported by people prepared to help him rebuild his life lawfully.

A six-month sentence on the wire fraud count, followed by the mandatory consecutive twenty-four-month sentence for aggravated identity theft, appropriately

reflects the seriousness of the offenses, promotes respect for the law, provides just punishment, and affords adequate deterrence. At the same time, it accounts for Mr. Shushlebin's lack of any prior criminal record, his conduct during incarceration, his family circumstances, his immigration consequences, and his inability to apply First Step Act earned time credits once subject to a final order of removal. For these reasons, and those developed more fully below and at sentencing, the defense respectfully requests a total sentence of thirty months' imprisonment.

## I. PERSONAL AND FAMILY BACKGROUND.

The conduct underlying this case is serious, and Mr. Shushlebin does not ask this Honorable Court to disregard it. But § 3553(a) requires consideration of the person who committed the offense, not simply the offense itself. And the record concerning Mr. Shushlebin's life before this case and, significantly, his conduct since his arrest demonstrates that the crimes do not define the entirety of his character or his prospects for the future.

Indeed, before this case, Mr. Shushlebin had no criminal history. Draft PSR ¶¶ 68-74. That absence is consistent with the picture presented by the people who have known Mr. Shushlebin throughout the different stages of his life. This Honorable Court has received letters from his mother and relatives in Russia; friends who have known him for more than a decade; people who worked with him professionally; individuals who volunteered with him; members of the spiritual and

meditation communities in which he participated; and, perhaps most significantly, correctional personnel who have observed him during his incarceration. Their accounts come from different places and different periods of Mr. Shushlebin's life, but repeatedly describe the same qualities: generosity, reliability, devotion to family, concern for others, and a willingness to give his time when others needed help.

Mr. Shushlebin was born in 1980 in Yeniseysk, Russia, the only child of Vladimir and Ludmila Shushlebin. Draft PSR ¶¶ 75-76. His father worked in communications, while his mother operated a retail store. Mr. Shushlebin was a good student and was highly active in athletics, including soccer, hockey, volleyball, and karate. *Id.* ¶ 76. Maxim Sobolev, now the Director of the STEMI Student Campus in Russia, has known Dmitry since their school years. He remembers him as a diligent student who "actively helped his father build their family home," and recalls that Dmitry's parents served as "strong moral role models for him." Ex. 14 (Letter of Maxim Sobolev). His uncle, Vladimir Shushlebin, similarly recalls that Dmitry "studied diligently and performed well academically," ultimately obtaining a higher education and establishing his own business in Russia. Ex. 21 (Letter of Vladimir Shushlebin). The Draft PSR confirms that Mr. Shushlebin went considerably further academically. He holds two master's degrees from Russian universities, one in Software Development and another in Economic Accounting. Draft PSR ¶¶ 92-93.

Mr. Shushlebin came to the United States in 2013. He initially settled in

Colorado, briefly lived in New York, returned to Colorado, and ultimately moved to Florida in 2017. Draft PSR ¶ 82. His mother recalls that he came here with his then-wife Yana and that together they opened a small language school in Colorado. She describes a son who "always loved the United States and dreamed of living here" and who deeply valued the opportunity to build a life in this country even after the school failed and his first marriage ended. Ex. 1 (Letter of Lyudmila Shushlebina).

Mr. Shushlebin eventually became a lawful permanent resident. Draft PSR ¶ 84. As a result of the convictions in this case, however, the PSR recognizes that he is now "subject to potential deportation under federal immigration law." *Id*. Thus, whatever sentence the Court imposes will be accompanied by the likelihood that the life Mr. Shushlebin spent more than a decade building in this country will itself come to an end.

Family has remained a central part of Mr. Shushlebin's life. His older cousin, Oleg Baykalov, remembers that even as a young man Dmitry regularly helped his grandparents with household tasks, particularly when his grandfather – a disabled World War II veteran – became seriously ill. Ex. 16 (Letter of Oleg Baykalov). Aleksandr Gavrishchuk, who has known Dmitry for approximately fifteen years, similarly describes Dmitry's relationship with his parents as a longstanding priority. *See* Ex. 2. That relationship has assumed greater importance following a significant family tragedy. Mr. Shushlebin's father died of a heart attack in 2024. PSR ¶ 77.

That same year, his mother suffered a heart attack of her own. She now "lives alone in Russia with declining health." *Id*. Mr. Shushlebin remained close to his father until his death and continues to speak with his mother approximately once each week throughout his incarceration. *Id*. ¶ 78. When his father died, Dmitry returned to Russia. Mr. Sobolev witnessed what followed. Dmitry "took responsibility for organizing the funeral ceremony at the church" and arranged for both close and distant relatives to attend notwithstanding the substantial travel and logistical difficulties involved. Mr. Sobolev viewed those efforts as another example of Dmitry's concern for his mother. Ex. 14. His cousin likewise remembers seeing "the Dmitry I had always known, only deeply grieving the loss of a loved one and cherishing his relationships with his relatives." Ex. 16.

His mother, now 74, describes the consequences of his absence most poignantly. Dmitry is her only child. She writes: "I am seventy-four years old and live alone, and Dmitry is my only son and my only support. His absence has been a great loss for me." Ex. 1. Mr. Gavrishchuk independently confirms the nature of that relationship. Following his father's death, he explains, "Dmitry became the sole support and main helper to his mother." He has watched Dmitry continue to worry about and support her, and describes Dmitry's "strong bond with his family and his devotion to his mother" as having "always been his top priority." Ex. 2. None of this eliminates the consequences appropriately attributable to Mr. Shushlebin. His

mother herself expressly recognizes that. She tells the Court: “I understand the seriousness of what has happened and do not try to justify his actions.” Ex. 1. It does, however, identify an additional human consequence of incarceration: an elderly woman in declining health, recently widowed, whose only child and principal source of support is incarcerated thousands of miles away.

### ***A. Mr. Shushlebin is someone who repeatedly helped others asking for nothing in return.***

The letters contain many expressions of affection for Mr. Shushlebin. More persuasive, however, are the concrete examples underlying those opinions. Again and again, the writers describe circumstances in which Dmitry devoted his own time to another person without any obvious benefit to himself and without asking for anything in return.

Mr. Gavrishchuk provides one example. When he was struggling with his health, Dmitry did more than express concern: he prepared a detailed nutrition plan, helped him develop an exercise program, and regularly went to the gym with him. Ex. 2. Irina Pantileeva tells a similar story. She met Dmitry in 2018 when they played on the same amateur volleyball team. The two were not particularly close. But when Ms. Pantileeva later experienced serious health problems, Dmitry nevertheless supported and helped her through that difficult period. That assistance mattered enough that, years later, she wrote that Dmitry had become for her “an example of kindness, compassion, understanding, and selflessness.” Ex. 9 (Letter of Irina

Pantileeva).

Vitaliy Chernikau remembers something similar. During difficult periods in his own life, Dmitry provided emotional support, advice, and perspective. Mr. Chernikau explains that Dmitry "in many ways treated me like an older brother" and that the support "was always sincere and came from a genuine desire to help." Ex. 19 (Letter of Vitaliy Chernikau). Vladislav Rebenkov's account is perhaps even more telling because it describes not a dramatic event, but simply the decision to remain present when another person was struggling:

> Dmitry was one of the very few people who did not distance himself, who did not disappear, and who did not pretend that it was not his concern. He stayed present. Quietly, without unnecessary words, but with genuine care and support. Those are the kinds of things a person does not forget.

Ex. 20 (Letter of Vladislav Rebenkov). These are not generalized assertions. They are specific examples, offered independently by people who knew him in different periods of his life, of what he did when someone else needed help.

For years before this prosecution, Mr. Shushlebin also participated in spiritual, meditation, and service-oriented communities. Andrew Farretta met him approximately five years ago through spiritual prayer circles. What began as attendance became sustained volunteer work. Mr. Farretta and Dmitry worked "side by side nearly every weekend for a considerable stretch of time," preparing for and supporting prayer ceremonies. Ex. 3 (Letter of Andrew Farretta). The work was

entirely voluntary and often required long hours, physical labor, and personal sacrifice. *Id.* Yet, as Mr. Farretta recalls, "Dmitry showed up consistently and never complained." *Id.* More importantly, Mr. Farretta distinguishes between occasional charitable conduct and what he actually observed from Dmitry over time:

> His kindness was not performative or occasional, it was a consistent pattern of behavior that defined every interaction I witnessed.

Ex. 3. David Gutierrez encountered Dmitry through similar prayer circles and remembers someone who participated "in a sincere and peaceful manner" and approached others "with humility and a genuine interest in connecting with others in a respectful environment." Ex. 5 (Letter of David Gutierrez). Diana Miettinen met him through Tensegrity seminars and recalls their shared interests in Buddhism, meditation, and self-improvement; she came away believing that Dmitry "genuinely wanted to improve himself spiritually." Ex. 6 (Letter of Diana Miettinen). Laura Kazimer observed the same quality at holistic health and wellness gatherings: Dmitry appeared genuinely interested "to work on himself and grow in a positive direction." Ex. 12 (Letter of Laura Kazimer). Ruben Tobon's description captures the service component of that community particularly well. He met Dmitry while volunteering at a spiritual retreat and subsequently encountered him at healing and art related events. Dmitry helped Mr. Tobon with significant tasks simply for the satisfaction of helping. Mr. Tobon calls that concept "gifting service" and writes: "Not too many humans understand the concept of 'gifting service', Dima does." Ex.

17 (Letter of Ruben Tobon).

Others saw those traits not in spiritual settings or friendship, but while working beside Mr. Shushlebin under demanding conditions. In 2023, Mr. Shushlebin participated in the construction of a complicated art installation for Burning Man. Dmitriy Seregin describes a project that required months of preparation, coordination, budgeting, fabrication, logistics, safety planning, and trust among a large group. During that process, Dmitry was "calm, respectful, and solution-oriented." Ex. 7 (Letter of Dmitriy Seregin). He "listened carefully, took commitments seriously," remained constructive when problems arose, and paid particular attention to safety and the effect of the project on others. *Id*. Igor Novikov, who worked and lived alongside Dmitry during the project, remembers that he took an active role in construction and assisted with organization, logistics, and purchasing. What impressed him most, however, was that Dmitry was "always willing to step in wherever help was needed" and was "quick to offer help when someone faced difficulties." Ex. 8 (Letter of Igor Novikov). Nikita Budkin, one of the project's lead managers, provides perhaps the clearest illustration. Their group was constructing "Blast Off," an approximately forty-foot tower shaped like an airplane. Heavy rain left the group stranded in the desert with ten tons of metal that still needed to be assembled. Some participants could not tolerate the conditions and abandoned their teams. Mr. Budkin recalls that Dmitry did the opposite:

> During events like these, under the harshest environmental and physical conditions, a person is fully revealed and shows their true character. Dmitry proved that he is a very kind, responsible, and helpful person. He was a part of the team and always was ready to contribute everything he had.

Ex. 15 (Letter of Nikita Budkin).

Sergei Kazalinskii's letter is valuable for a different reason. He and Dmitry attempted to establish an appliance repair company together. The venture ultimately ended because the two disagreed on certain matters. Yet despite that conclusion to their business relationship, Mr. Kazalinskii still believed it important to tell the Court that Dmitry "approached the work seriously, stayed involved, and carried himself in an organized and responsible manner." Ex. 18 (Letter of Sergei Kazalinskii). Mr. Shushlebin's entrepreneurial interests also extended beyond ordinary commercial ventures. Julie Brisson met him in Peru in 2024 while he was exploring a tourism project in the Sacred Valley. His proposal was not simply to bring tourists to archaeological sites. He envisioned visitors spending time in small villages, learning about Quechua culture, working with villagers, and learning about traditional practices and medicinal plants. Ms. Brisson believed that he intended both to expose visitors to indigenous communities and to provide opportunities for locals. Ex. 11 (Letter of Julie Brisson).

### ***B. Mr. Shushlebin's conduct since arrest provides particularly compelling evidence of his ability to rehabilitate.***

This Honorable Court need not rely solely on family and friends to determine whether the qualities described above remain present or whether Mr. Shushlebin is capable of rehabilitation. Some of the strongest evidence comes from the people responsible for supervising him while incarcerated. Chaplain Zacks of the Citrus County Detention Facility reports that Mr. Shushlebin has been "coming to Chapel quite frequently." Ex. 22 (Letter of Chaplain Zacks). The two have spoken repeatedly about his incarceration, and the chaplain has counseled and prayed with him. His assessment is simple: "He truly is seeking God and has left everything in His Hands."

More significant still is the assessment from his case manager. Case Manager Winkelholz writes: "Mr. Shushlebin has had no disciplinary reports since he has been at this facility." The case manager further states: "I have never once witnessed Mr. Shushlebin be rude, aggressive, hostile, or impolite towards any staff members at this facility." The letter adds that he "is respectful and supportive towards other inmates at this facility." Ex. 23 (Letter of Case Manager N. Winkelholz). Programs Officer Wyatt goes still further. Based on observations of Mr. Shushlebin in the dormitory and at chapel, the officer writes: "He is a mentor to others, he is always willing to learn, always willing to help." Ex. 24 (Letter of Programs Officer Wyatt).

These observations deserve particular weight. Family members and friends understandably want the Court to see the person they have known. Correctional

personnel have no comparable experience. They describe what Mr. Shushlebin has actually done while incarcerated, under rules and supervision and during one of the most difficult periods of his life. He has accumulated no disciplinary reports. He has treated staff respectfully. He has supported other detainees. He attends chapel, seeks counseling, and has become a mentor to others. That is concrete evidence of rehabilitation already underway.

Mr. Shushlebin's mother recognizes both the gravity of the present circumstances and the possibility of something better emerging from them. She writes: "As a mother, I see that Dmitry sincerely regrets what occurred and speaks about his desire to take responsibility, learn from his mistakes, and begin a new life in an honest and lawful way." Ex. 1. Mr. Rebenkov expresses substantially the same belief based on his own experience with Dmitry: "I sincerely believe that he has the ability to reflect on what has happened, to learn from it, and to move forward in a better and more constructive way." Ex. 20. The available evidence suggests that process has already begun.

Mr. Shushlebin is not entitled to be sentenced as though these offenses never occurred. But neither should he be sentenced as though nothing came before them or nothing can come after. He arrived at this case at age 44 with no juvenile adjudications, no adult convictions, no pending charges, and no other arrests. PSR ¶¶ 68-74. He is highly educated, has worked throughout his adult life, has

meaningful family responsibilities, and has a substantial network of people prepared to support him. Most importantly, his actual behavior during incarceration demonstrates that he can live within rules, respond constructively to punishment, and contribute positively even under adverse circumstances. Those characteristics are directly relevant to the punishment necessary to accomplish the purposes of sentencing and strongly support the conclusion that a sentence substantially below the advisory Guidelines range is sufficient, but not greater than necessary.

## II. SENTENCING GUIDELINE CALCULATION.

### A. *The advisory guidelines should be calculated without the disputed Square transactions.*

Following the submission of additional objections to the Draft PSR, the parties' competing positions have materially narrowed. The government has agreed that the previously challenged merchants are not attributable to Mr. Shushlebin. Removing those merchants reduces Sunbit's loss and restitution request to $377,815.09. And once those merchants are removed, Sunbit's transaction data identifies May 25, 2023 as the last remaining Sunbit loan or credit card charge attributable to Mr. Shushlebin. *See* Ex. 25 at 1-3 (Sunbit Aug. 19, 2026 Letter). The parties also agree that Mindbody's loss is $81,024.60. The resulting agreed calculation is therefore $458,839.69. Because $458,839.69 is more than $250,000 but not more than $550,000, the current § 2B1.1(b)(1) table calls for a twelve-level increase.

The remaining dispute concerns $171,228.62 in disbursements processed through Square. The issue is whether those transactions produced an economic loss separate from the Sunbit credit card balances already included in Sunbit's $377,815.09 restitution claim. The defense respectfully contends that they did not and, at a minimum, that the government has not presented sufficient reliable evidence to support their inclusion in either the Guidelines loss calculation or restitution.

The Square transactions involved exclusively Sunbit credit cards, and the resulting card balances are already reflected in the records underlying Sunbit's restitution claim. *See* Ex. 26 at 24-29 (Report of Investigator William Soronsen) (explaining that all 95 card references in the Square data begin with BIN 401351, the BIN associated with TAB Bank, the issuer of the Sunbit Card, and that the destination bank accounts recur in both the Square data and the data supporting Sunbit's restitution request). Treating the Square disbursements as a separate category of loss would therefore count the same loss twice.

Square has not requested restitution and, as the payment processor, would not ordinarily bear the underlying credit loss. Sunbit, by contrast, has provided the government with discovery and detailed loss analyses and, through sophisticated counsel, has affirmatively identified the amounts for which it seeks restitution. Yet Sunbit has claimed no credit card loss beyond the $77,137.08 already included in its

total claim of $377,815.09. *See* Ex. 25. That omission is significant. If the $171,228.62 reflected a separate, additional credit card loss, Sunbit, the entity that funded and bore that loss, would have identified it in its restitution submissions. It did not.

Moreover, the Square data on which the government relies is incomplete in a critical respect: it does not account for repayments made on the underlying credit card obligations. That omission prevents the Square disbursement data, standing alone, from establishing the amount of any loss or the concomitant restitution obligation. Under Application Note 3(E)(i) to U.S.S.G. § 2B1.1 "[l]oss shall be reduced by" "the money returned" to the victim "by the defendant or other persons acting jointly with the defendant." Consistent with that principle, the Eleventh Circuit has explained that, in the lending context, "the loss is the amount of the loan not repaid at the time the offense is discovered." *United States v. Menichino*, 989 F.2d 438, 441 (11th Cir. 1993); *see also United States v. Cusumano*, No. 1:14-cr-1-MW-GRJ, 2015 WL 10324107, at *5 (N.D. Fla. Dec. 31, 2015), *report and recommendation adopted*, 2016 WL 707433 (N.D. Fla. Feb. 22, 2016), *aff'd*, 686 F. App'x 828 (11th Cir. 2017) ("[W]here, as here, the defendant returned money to the victims before the fraud was detected, the loss amount must be reduced by the fair market value of the returned money."). Accordingly, the government cannot establish an additional $171,228.62 in loss merely by identifying gross or net

disbursements through Square while omitting the corresponding repayment history or evidence regarding the actual amount that remains owed.

Because the inclusion of the disputed $171,228.62 Square category determines whether the current loss table produces a twelve- or fourteen-level increase, this Honorable Court should exclude the $171,228.62 Square category from both the Guidelines loss calculation and restitution unless the government produces a reliable reconciliation establishing both that the Square amounts are distinct from the Sunbit losses already counted and that any corresponding repayments or credits have been properly deducted.

**B. *The Sentencing Commission's adopted inflation adjustment warrants a two-level downward variance.***

There is an additional and independent reason why the current $550,000 threshold should not meaningfully influence the sentence imposed. On April 16, 2026, the Sentencing Commission unanimously adopted an inflation adjustment to § 2B1.1 and submitted the amendment to Congress, with an effective date of November 1, 2026. Under the adopted table a fourteen-level increase does not apply unless the loss exceeds $750,000. U.S. Sent'g Comm'n, 2026 Amendments to the Sentencing Guidelines, Amendment 2, at 14 (Apr. 2026).

Even if this Honorable Court were to include the entire disputed $171,228.62 Square category, the resulting loss would be $630,068.31, well below the Commission's newly adopted $750,000 threshold, and would still result in only a

twelve-level increase under the amended table. The Sentencing Commission's formal and unanimous decision thus provides powerful policy evidence that the existing $550,000 threshold no longer reflects an appropriate measure of culpability. Accordingly, even if the current table technically produces a fourteen-level increase, the Court should vary downward by the equivalent of two levels rather than allow an obsolete threshold to dictate the sentence.

**C. *The sophisticated-means enhancement should not apply.***

The defense respectfully objects to the two-level enhancement for sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C). The PSR's sophistication theory depends heavily on its portrayal of the offense as an extended, multi-year, multi-state scheme. The government's concession concerning the California merchants substantially narrows the duration, geographic scope, and overall scale on which the PSR's sophistication finding was premised. Once those disputed Sunbit loans are excluded, the remaining conduct is considerably more limited: it spans approximately two years, involves approximately $300,000 less in loss than originally attributed to Mr. Shushlebin, and is centered principally in Florida. Viewed in that materially narrower context, the conduct does not rise to the level of "especially complex or especially intricate" execution or concealment required to support the sophisticated-means enhancement. U.S.S.G. § 2B1.1 cmt. n.9(B).

To qualify for the sophisticated-means enhancement, the conduct must be "very complex or complicated." *United States v. Buchanan*, 146 F.4th 1342, 1357 (11th Cir. 2025). The enhancement is therefore appropriate only where the defendant's conduct "shows a greater level of planning or concealment than a typical fraud of its kind." *United States v. Fountain*, 792 F.3d 310, 319 (3d Cir. 2015) (*quoting United States v. Fumo*, 655 F.3d 288, 315 (3d Cir. 2011)). As Judge Millett explained in *United States v. Milligan*, the structure of § 2B1.1(b)(10) requires "sophisticated means" to be read in light of the examples that precede it: relocating a fraudulent scheme to another jurisdiction to evade law enforcement or committing a substantial part of the scheme from outside the United States. 77 F.4th 1008, 1017–18 (D.C. Cir. 2023) (Millett, J., concurring in part, dissenting in part, and dissenting from the judgment). Relying on the Supreme Court's guidance in *Johnson v. United States*, 576 U.S. 591, 598 (2015), Judge Millett reasoned that the word "otherwise" introduces a residual clause that must be interpreted in light of the preceding enumerated examples. *Milligan*, 77 F.4th at 1017-18. Those examples share a common theme: the sophisticated manipulation of jurisdictions, regulatory systems, or law-enforcement barriers to make detection more difficult. *Id.* at 1018. Routine deception, false names, or concealment inherent in ordinary fraud is not enough.

That limiting principle matters here. The conduct involved the creation of synthetic identities and loan submissions through a fictitious business. Those acts

may be fraudulent, but they are not materially different from the ordinary mechanics of identity or loan fraud. *See Milligan*, 77 F.4th at 1014 ("For purposes of the enhancement, ... sophistication 'refer[s] not to the elegance, the "class," [or] the "style" of the defrauder[,] ... but to the presence of efforts at concealment that go beyond ... the concealment inherent in [] fraud.'"). Nor does the record show the kind of jurisdictional manipulation, offshore structure, concealment, or law enforcement evasion contemplated by § 2B1.1(b)(10). Here, the alleged conduct was already traceable and largely routine, and without the disputed California Sunbit loans, largely localized. The records remained traceable through domestic accounts and ordinary payment platforms; the government recovered the relevant records; and there is no allegation of structuring designed to defeat investigators, or comparable concealment beyond that inherent in the offense.

**D. *The government has not established a four-level organizer or leader enhancement.***

Section 3B1.1(a) requires proof both that Mr. Shushlebin acted as an organizer or leader and that the criminal activity involved five or more criminally responsible participants or was otherwise extensive. A "participant" means "a person who is criminally responsible for the offense, even if not convicted." U.S.S.G. § 3B1.1 cmt. n.1. While the "guideline offers no further definition of 'participant' or what it means to be 'criminally responsible,' [] cases applying the guideline uniformly count as participants persons who were (i) aware of the criminal objective, and (ii) knowingly

offered their assistance." *United States v. Rathod*, 826 F. App'x 527, 537 (6th Cir. 2020); *United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001) ("a person is 'criminally responsible' under § 3B1.1 only if 'he commit[s] all of the elements of a statutory crime *with the requisite mens rea*'") (internal citations and quotations omitted) (emphasis in original). Thus, the enhancement cannot be supported by simply counting employees, contractors, or service providers unless the government establishes that each person was criminally responsible for the offense conduct. *United States v. Holden*, 908 F.3d 395, 403 (9th Cir. 2018) ("unwitting facilitators of an offense, even if they are 'participants' in the usual sense of the word, do not count.").

That proof is absent as to each of the four individuals whom the government seeks to count as criminally responsible participants:

(1) Sanjar Jamilov was convicted of submitting false voter registrations in violation of 52 U.S.C. §§ 10307(c) and 20511(2)(A) and sentenced by this Honorable Court to time-served (less than six months), not for wire fraud or any offense involving Sunbit. His conviction therefore does not establish that he knowingly participated in the financing scheme at issue here. More importantly, Mr. Jamilov stated during his proffer that he did not submit Sunbit loan applications and that Sunbit was within Mr. Shushlebin's purview. The Draft PSR similarly states that Mr. Jamilov was

hired "under the guise of legitimate work" for a credit repair company. Draft PSR ¶ 56. Those facts do not establish that he knew of, much less knowingly assisted, the charged wire fraud.

(2) Inna Kuznietsova was never charged and worked for Mr. Shushlebin for less than three months. According to the Draft PSR, she too was hired "under the guise of legitimate work". Draft PSR ¶ 56. The conduct attributed to her appears to consist of entering information into a computer supplied by Mr. Shushlebin. The evidence does not establish that she knew her work would be used to obtain fraudulent financing, or that she shared the criminal objective of the scheme charged.

(3) Vladimir Ogorodov's involvement was still more attenuated. Ms. Kuznietsova's Rule 15 deposition indicates that he worked for only one or two weeks, apparently performing the same type of computer data entry. The Draft PSR identifies no statement, communication, or other evidence demonstrating that he knew the work furthered fraudulent loan applications.

(4) Hafeez Russell, a social media content creator from Bangladesh or London, created generic marketing materials and seasonal greetings, such as wishing followers a happy new year and advertising affordable dental services, for Amaro Dental. Nothing in the content of Mr. Russell's post

reveals his knowledge that Amaro Dental was fictitious or that its online presence would be used to support fraudulent financing applications. Without evidence that Mr. Russell understood the fraudulent purpose of the business or his work, he was merely an unwitting service provider and cannot be counted as a criminally responsible participant.

The "otherwise extensive" alternative does not eliminate the requirement of a genuinely extensive criminal operation. The Eleventh Circuit considers the length and scope of the activity and the number of persons involved. *United States v. Holland*, 22 F.3d 1040, 1046 (11th Cir. 1994). Here, the alleged work by others was short and limited: Mr. Jamilov and Ms. Kuznietsova worked for less than three months, Mr. Ogorodov for one or two weeks, Mr. Russell's work consisted of posting several generic social media posts, and the Amaro Dental Sunbit activity occurred for less than 3 months (from January 5 through March 19, 2023).

**E. *The cumulative effect of overlapping enhancements warrants a variance.***

Even if this Honorable Court overrules any of the preceding objections, the resulting Guideline range would substantially overstate the seriousness of the conduct because multiple enhancements repeatedly measure the same underlying features. The loss table measures the asserted financial scale. The victim, access-device, sophisticated-means, and role provisions then add punishment based on the same identities, accounts, transactions, and use of others that produced that loss. The

mandatory consecutive twenty-four months under 18 U.S.C. § 1028A separately punishes the identity related conduct at the center of the scheme.

This case presents the same concern recognized in *United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003), *vacated on other grounds*, 543 U.S. 1097 (2005), where the Second Circuit held that the "cumulative effect" of "substantial[ly] overlap[ping]" enhancements may have "a significant effect upon the applicable sentencing range" and may warrant a variance. It also mirrors *United States v. Jackson*, 346 F.3d 22, 26–27 (2d Cir. 2003), where the court held that a reduction was available because fraud enhancements for loss amount, planning, sophisticated means, and extensive activity were "little more than different ways of characterizing closely related aspects" of the same fraudulent scheme. *Id.* at 26. Although those enhancements were "sufficiently distinct to escape the vice of double counting," the court recognized that they "substantially overlap[ped]" because "[m]ost fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive." *Id.* at 26–27.

Here, the challenged enhancements do not identify independent harms. Instead, they multiply the effect of a common set of facts. This Honorable Court should account for that overlap through a variance under § 3553(a).

## III. THE § 3553(a) FACTORS SUPPORT A TOTAL SENTENCE OF THIRTY MONTHS.

### A. *Mr. Shushlebin's history, characteristics, and demonstrated rehabilitation favor a limited sentence.*

The preceding background section describes a 44-year-old man who entered this case without an adult conviction, pending charge, or prior arrest. He earned two master's degrees, worked throughout his adult life, supported elderly and medically infirm parents, and formed lasting relationships with people who recount concrete acts of generosity, loyalty, and service. Those circumstances do not excuse the offenses. They do, however, place them in context and demonstrate that the conduct before this Honorable Court is an aberration in an otherwise productive life. They also show that Mr. Shushlebin has the education, family support, and personal capacity to return to lawful and constructive work.

His conduct in custody provides perhaps the clearest measure of his present character and future risk. He has received no disciplinary reports, has treated staff and fellow detainees respectfully, attends chapel, and has been described by institutional personnel as a mentor who is willing to learn and help others. His incarceration has produced reflection and constructive behavior, not further misconduct.

A thirty-month sentence also provides more than adequate deterrence. It is a substantial term of imprisonment, followed by the likely loss of Mr. Shushlebin's

permanent resident status and the life he built in this country, together with restitution and other financial consequences. Specific deterrence is likewise fully addressed by his first experience with incarceration, the violence and medical consequences he has endured while detained, *see infra* at 26-27, his spotless disciplinary record, his age, and the support available to him upon release. Nothing in this record suggests that a longer term on the wire fraud count would materially enhance protection of the public.

The requested sentence also preserves proportionality. It recognizes the seriousness of the conduct and the real financial losses sustained by the institutions involved, while avoiding punishment greater than necessary to achieve the purposes of sentencing. Taken together, Mr. Shushlebin's background, conduct in custody, collateral consequences, and the substantial punishment already inherent in a thirty-month sentence demonstrate that a lengthy additional term on the wire fraud count is unnecessary for either specific or general deterrence.

**B. *His pretrial confinement has been materially harsher than ordinary incarceration.***

The Eleventh Circuit has recognized that unusually harsh presentence confinement may support a reduced sentence in an appropriate case. *United States v. Pressley*, 345 F.3d 1205, 1219 (11th Cir. 2003). After *Booker*, the same circumstances are independently relevant to just punishment and the sentence necessary under § 3553(a).

Mr. Shushlebin's experience during pretrial detention has been far outside the ordinary. Medical records reflect that in August 2025 he reported being struck by a correctional officer in the knee on which he had undergone surgery, causing bruising, sharp pain, and worsening PTSD symptoms. In September 2025, another inmate struck him in the head and face. The injuries required emergency room treatment, facial stitches, mental health treatment, and urgent outside ophthalmology care for continuing pain and decreased vision in his left eye. He reports that his vision remains worse to this day. He was later robbed by another inmate, became fearful for his safety, and was moved again to another unit. *See* Defense Objections to PSR ¶ 88 & Ex. 3.

These are concrete, medically corroborated facts about the punishment Mr. Shushlebin has already endured. They aggravated preexisting PTSD, required mental health treatment, and imposed physical and psychological consequences well beyond those contemplated by the advisory range. The Court should give those conditions substantial mitigating weight.

**C. *Immigration consequences and the inability to apply First Step Act credits make any term of imprisonment more severe.***

Mr. Shushlebin is a lawful permanent resident who faces likely immigration detention and removal after completing the sentence. Those consequences will separate him permanently from the life he built in the United States and may add civil detention beyond the term this Honorable Court imposes.

Likewise, once a prisoner is the subject of a final order of removal, 18 U.S.C. § 3632(d)(4)(E)(i) makes him ineligible to apply earned time credits toward prerelease custody or supervised release. Mr. Shushlebin may complete the same recidivism reduction programs as a comparable citizen yet remain incarcerated longer because he cannot apply the resulting credits. Accordingly, the defense asks this Honorable Court to account for the concrete statutory consequence that will follow if a final removal order is entered.

## IV. CONCLUSION

For the foregoing reasons, Mr. Shushlebin respectfully requests that this Honorable Court impose a total sentence of thirty months imprisonment: six months on the wire fraud count and the mandatory consecutive twenty-four months on the aggravated identity theft count, followed by such term and conditions of supervised release as the Court deems appropriate.

Dated: September 8, 2026

Respectfully Submitted,
DMITRY SHUSHLEBIN
By His Attorney,

**/s/ Maksim Nemtsev**

Maksim Nemtsev, Esq.
Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
max@mnpc.law

**CERTIFICATE OF SERVICE**

I, Maksim Nemtsev, hereby certify that on this date, September 8, 2026, a copy of the foregoing document has been served via ECF on all registered participants.

**/s/ Maksim Nemtsev**

Maksim Nemtsev, Esq