**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 8:25-cr-76-TPB-AAS |
| | ) | |
| DMITRY SHUSHLEBIN, | ) | |
| | ) | |
| Defendant. | ) | |

# UNITED STATES' SENTENCING MEMORANDUM

Dmitry Shushlebin committed himself to a life of deception and fraud many years ago. Shushlebin' deception began in 2014 when he created a fraudulent business for the sole purpose of obtaining permission to work in the United States. And it continued until 2019 when Shushlebin initiated an extensive (and multi-year) wire fraud scheme that resulted in substantial financial harm to two companies and the theft of identities for dozens of individuals. For the reasons elaborated below, the United States respectfully submits that the Court should sentence Shushlebin to a guidelines sentence.

## I. PROCEDURAL HISTORY

On February 18, 2025, a federal grand jury in the Middle District of Florida, Tampa Division, returned a seven-count Indictment charging Shushlebin and his co-conspirator with conspiracy, in violation of 18 U.S.C. § 371 (Count 1); giving false information in registering to vote, in violation of 52 U.S.C. § 10307(c) and 18 U.S.C. § 2 (Counts 2 and 3); submission of fraudulent voter registrations, in violation of 52

U.S.C. § 20511(2)(A) and 18 U.S.C. § 2 (Counts 4 and 5); and making false statements, in violation of 18 U.S.C. § 1001(a)(2) (Counts 6 and 7). Doc. 16. The United States then filed a four-count, Superseding Information on July 24, 2025, charging the defendant with conspiracy to give false information in registering to vote and submit fraudulent voter registrations, in violation of 18 U.S.C. § 371 (Count 1); wire fraud, in violation of 18 U.S.C. § 1343 (Count 2); making false statements, in violation of 18 U.S.C. § 1001(a)(2) (Count 3); and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) (Count 4). Doc. 69. Shushlebin pleaded guilty to all four counts in the Superseding Information on July 25, 2025. Docs. 72, 81.

## II. FACTUAL BACKGROUND

Shushlebin is a Russian citizen who, in March 2013, arrived in the United States on a temporary visa. PSR at ¶ 11. Less than one year after his arrival in this country, Shushlebin's fraud began. In the fall of 2013, Shushlebin created the fake business, the British Educational Center. A few months later, Shushlebin submitted an I-129 Petition claiming that the British Educational Center was a foreign language center that intended to offer Shushlebin permanent employment as the Chief Executive Officer. *See* Exhibit D at 4 (Excerpts of Shushlebin Alien File). In the petition, Shushlebin went to great lengths to make his fictious business appear legitimate. He submitted false tuition receipts, *see id.* at 5-28, stock photographs of children learning, *id*. at 29-39, and a forged lease agreement. *see id*. at 40-49.

Unfortunately, the British Educational Center would not be the last fake and fraudulent business Shushlebin created. In 2019, Shushlebin created another fake

company called Amaro Dental. To make Amaro Dental appear legitimate, Shushlebin (and others acting at his direction) created and maintained social media and other online pages for the dental office, left fake online patient reviews, and made filings with the Florida Division of Corporations. PSR at ¶ 27. Shushlebin needed Amaro Dental to appear real so that he could perpetuate his extensive wire fraud scheme and create dozens of fake (or synthetic) identities.

Part of Shushlebin's fraud scheme included "seasoning" these fake identities—that is, taking steps to make the fake identities appear real. To do so, Shushlebin directed his employees to submit approximately 132 false and fraudulent voter registration applications, in the names of fictitious individuals, to the Pinellas County Supervisor of Elections ("PCSOE"). PSR at ¶ 15. Shushlebin also instructed his employees to apply for credit cards and other financial accounts to create a credit history in the fake names. Shushlebin even went as fair as obtaining hunting and fishing licenses for these fake individuals.

Once Shushlebin believed his fake business and the fake identities he had created appeared to be legitimate, he would use the fake identities and fake businesses to apply for loans. By way of example, on January 6, 2023, Shushlebin used the identity of "Ariel Elston" to apply for a dental loan with Victim Bank 1. PSR at ¶ 29. To make Elston appear like a real client for a dental loan, Shushlebin hired a Russian actress to hold a photograph of a fake driver's license in the name of Ariel Elston. *Id*. In the loan application, Shushlebin falsely represented that the loan was for dental work to be performed by Amaro Dental—Shushlebin's fake dental

office. *Id*. On February 7, 2023, Shushlebin applied for a second fraudulent loan in the name of Ariel Elston. *Id*. at ¶ 29. Shushlebin perpetrated this scheme against Victim Bank 1 multiple times using hundreds of different synthetic identities, including fictitious voters Ariel Elston, Norbeto Sasser, and Foster Haugen. *Id*. at 28. Shushlebin also submitted a "Loan Program Agreement" with Victim Bank 1. Specifically, Shushlebin signed the agreement on behalf of "Amaro Dental LLC," pretending to be a dentist named "D.A." Between 2021 and 2023, Shushlebin executed several other identical agreements with Victim Bank 1 in the name of other fictitious businesses. These agreements enabled Shushlebin's fictitious businesses "to allow consumers to obtain a purchase money loan that can be used to purchase [the business's] Goods and/or Services for personal, family, or household purposes." *Id*. at ¶ 28.

From there, Shushlebin acquired credit card point-of-sale ("POS") machines connected to bank accounts registered under fictitious business entities that he created. *Id*. at ¶ 31. Shushlebin utilized these POS devices to process transactions using credit cards that had been fraudulently obtained in the names of synthetic identities—individuals fabricated as part of his broader scheme. *Id*. The proceeds from these fraudulent transactions were then transferred into additional bank accounts under Shushlebin's control, allowing him to further conceal and benefit from the illicit activity. *Id*. The funds were subsequently used for retail purchases, credit card payments, virtual currency acquisitions, and cash withdrawals. And Shushlebin also conducted over $43,000 in fraudulent credit card charges using a

POS machine in the name of multiple fictitious companies that he controlled, including, "Three Brothers Body Shop." *Id*. at ¶ 33. Shushlebin transferred $36,000 of those fraud proceeds to bank accounts in Russia. When considered together, Shushlebin fraud scheme resulted in approximately at least $630, 067 in intended losses. PSR at ¶ 50.

## III. OUTSTANDING OBJECTIONS TO THE PSR

**¶ 50 Shushlebin's Intended Loss Amount**

Shushlebin objects to the PSR's application of a 14- level enhancement because the loss is more than $550,000, but less than $1,500,000. That objection should be overruled.

Section 2B1.1 is the fraud guideline. *See* U.S.S.G. § 2B1.1. Under section 2B1.1(a), an offender starts with either six or seven base offense levels depending on the offense. *See id*. § 2B1.1(a). Then, more levels are added depending on the amount of the loss from the fraud scheme. *See id*. § 2B1.1(b)(1). For example, if the loss was between $550,000 and $1.5 million, then 14 levels are added to the base offense level. *Id*. And the guideline is clear: "[l]oss is the greater of actual loss or intended loss." § 2B1.1(b)(1)(a).

Shushlebin ignores the plain language of the guideline and instead argues that "loss" means the "actual unpaid loan balance." PSR Addendum at 27. But that argument is foreclosed by the Eleventh Circuit's decision in *United States v. Horn*. 129 F.4th 1275 (11th Cir. 2025). There, the Eleventh Circuit held that "loss" in section

2B1.1(b)(1) was unambiguous and it meant "the greater of actual or intended loss." *Id*. at 1300. In reaching that conclusion, the court turned to the text of Section 2B1.1, which instruct courts to consider both "actual loss" and "intended loss." *Id*. And because Section 2B1.1 explicitly defines loss as "the greater of actual loss or intended loss" there is no need to turn to the Application Notes in the Commentary to the Guidelines to know that a court should apply the greater of actual loss or intended loss. *Id*.

Here, the intended loss is greater than the actual loss. Shushlebin's intended loss amount is derived from three different fraud schemes: (1) Shushlebin's scheme against Victim Bank 1 for loans in the names of fraudulent businesses and fraudulent identities, attached hereto as Exhibit A, (2) Shushlebin's point-of-sale scheme—where Shushlebin used point of sale devices (like, for example, Square) to process transitions using credit cards that had been fraudulently obtained in the names of fake identities, attached hereto as Exhibit B, and (3) Shushlebin's fraudulent scheme relating to his fake business, Core Corner fitness, and Victim 2, attached hereto as Exhibit C. Taken together, the intended loss attributable to Shushlebin relating to Victim Bank 1 is at least $377, 815.09, the intended loss amount relating to the point-of-sale scheme is $171,228, and the loss amount relating to Victim 2 is $81,024.60. That is a total intended loss of at least $630,067.69. This is well above the $550,000 amount needed for the 14-level enhancement under U.S.S.G. § 2B1.1. As such, the PSR's application of the enhancement is warranted.

To the extent Shushlebin contends that the United States is double counting, Shushlebin is incorrect. To be sure, there is not a single overlapping merchant name on Exhibit A and B. What's more, Victim Bank 1 made clear that its loan and credit card balances are separate services and distinct loss amounts incurred by Victim Bank 1. PSR at 21-22.

**¶ 52 Sophistication Enhancement**

Shushlebin also objects sophisticated means enhancement. That enhancement should also be overruled. Under section 2B1.1(b)(10)(C), a defendant's offense level is enhanced by two levels if the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. U.S.S.G. § 2B1.1(b)(10)(C). Sophisticated means applies when the execution of the offense is complex or especially intricate. *Id*. cmt. n.9(B). Examples of sophisticated means listed in the commentary include hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts. *Id*. However, the application notes do not limit the ways in which a defendant could use sophisticated means to conceal his crime. *United States v. Mangano*, 749 F. App'x 910, 913 (11th Cir. 2018). In gauging sophistication, the court must examine the totality of the defendant's conduct, as there is no requirement that each of the defendant's individual actions be sophisticated. *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010). The use of repetitive, coordinated conduct to perpetuate and conceal a fraud scheme supports a sophisticated-means enhancement. *United States v. Bane*, 720 F.3d 818, 826-27 (11th Cir. 2013). Further, the length of

time for which the conduct is not detected can reflect on the sophistication of the scheme. *United States v. Feaster*, 798 F.3d 1374, 1381 (11th Cir. 2015).

Shushlebin's conduct warrants this enhancement. As part of Shushlebin's fraud scheme, he created multiple fake businesses—which he went to great lengths to make appear legitimate, including fabricating online profiles, creating false customer reviews, and submitting false business filings. He was equally strategic with his creation of synthetic identities. Shushlebin instructed his employees to apply for credit cards and other financial accounts to create a credit history in the fake names—which enabled him to apply for loans and credit cards in the names of the synthetic identities. Registered more than 132 fraudulent voter applications. The sophistication of Shushlebin's conduct is further evidenced by the scheme's endurance for multiple years without detection. In fact, as Victim Bank 1 made clear in its Victim Impact Statement, synthetic identity fraud is some of the most difficult to detect because there is no legitimate customer to report the fraud. For those reasons, the enhancement applies.

**¶ 56 Leader and Organizer Enhancement**

Shushlebin also objects to the leader and organizer enhancement. The sentencing guidelines call for a four-level increase in the defendant's offense level "[i]f [he] was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a).

First, and most fundamentally, the enhancement applies because Shushlebin was the leader and organizer of criminal activity that involved five or more

participants. Shushlebin hired four people who worked under his direction and control to further his fraud scheme. Specifically, Sanjar Jamilov, Inna Kuznietsova, and Vladimir Ogorodov worked at Shushlebin's fake company, Amaro Dental, and helped make the synthetic identifies appear real. They did so by submitting fake voter applications, submitting fraudulent applications for financial accounts. And even applying for (and obtaining) hunting and fishing licenses. And Shushlebin did not stop there: he also hired Hafeez Russel, who maintained the Facebook page that was intended to make Amaro Dental appear legitimate.

The enhancement also applies because Shushlebin's control was extensive. The eleventh circuit considers several factors when determining whether the defendant was an organizer or leader:

> (1) the exercise of decision[-]making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

*United States v. Shabazz*, 887 F.3d 1204, 1222 (11th Cir. 2018). But all the factors need not be present. *United States v. Caraballo,* 595 F.3d 1214, 1231 (11th Cir. 2010). And the guidelines "require[ ] only evidence that the defendant exerted some control, influence or decision-making authority over another participant in the criminal activity." *Dixon*, 901 F.3d at 1348. Here, Shushlebin exercised decision-making authority over the other participants. He told them what to do, and when to do it. These individuals were recruited by Shushlebin, directed by Shushlebin, and

controlled by Shushlebin for Shushlebin's own benefit. Accordingly, the enhancement applies.

## IV. APPLICATION OF 3553(A) FACTORS

In sentencing a criminal defendant, the court must consider the advisory guidelines range and the factors set forth in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Rosales-Bruno*, 789 F.3d 1249, 1253-54 (11th Cir. 2015). The Section 3553(a) analysis begins with the court's consideration of the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Moreover, the sentence imposed should (1) adequately reflect the seriousness of the offense, (2) promote respect for the law, (3) provide just punishment, (4) afford adequate deterrence, (5) protect the public from future crimes of the defendant, and (6) provide the defendant with any necessary training or treatment. 18 U.S.C. § 3553(a)(2). The court should also consider the kinds of sentences available, any pertinent policy statement, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553 (a)(3)-(6).

### A. <u>Nature and Circumstances of the Offense</u>

The nature of Shushlebin crimes, which include a multi-year scheme, favor a high-end guidelines sentence. Shushlebin orchestrated a sophisticated and multi-layered fraud scheme using fake identities and fake businesses. He manipulated others to apply for credit cards and other financial accounts using these synthetic identities. PSR at ¶ 28. He obtained hunting and fishing licenses for these fake

individuals. *Id*. at ¶ 29. And he even registered more than 132 fraudulent voter applications.

Using the fake identities, Shushlebin applied for (and obtained) loans from Victim Bank 1. *Id*. at ¶ 30. He also applied for (and obtained) credit cards from Victim Bank 1 in the names of the fake identities he had created. *Id*. at ¶ 30. In total, Shushlebin applied for multiple loans from Victim Bank 1—and Victim Bank 1 issued hundreds of thousands of dollars in loans to Shushlebin that it was unable to recover. Shushlebin also obtained credit cards from Victim Bank 1 in the name of his synthetic identities, and he charged over $82,000 to those credit cards. Victim Bank 1 is a company built to help consumers afford necessary health care expenses, utilizing dental loans or synthetic identities to defraud the company. As Victim Bank 1 explained, "every dollar lost to Shushlebin's scheme tightens credit for the actual consumers Victim Bank 1 serves." In other words, legitimate, deserving recipients of much-needed health care were potentially deprived of that assistance as a direct result of Shushlebin's fraud scheme.

Using the fictious companies, Shushlebin also made point-of-sale ("POS") purchases and other forms of credit card and loan fraud. PSR at ¶¶ 31-36. His conduct also harmed payment processors, including Company 2 which lost at least $81,024.60 due to the defendant's fraudulent credit card transactions. *Id*. at ¶ 34.

**B. <u>The History and Characteristics of the Defendant</u>**

Although Shushlebin has no criminal convictions, he has repeatedly engaged in deceit and fraud. As explained above, shortly after his arrival in the United States,

Shushlebin created the British Educational Center—a fake business that Shushlebin used to submit a I-129 Petition on his own behalf. *See* Ex. A at 1-4.

But Shushlebin's lies and deception did not stop at the Petition. When officials from the United States Citizenship and Immigration Services ("USCIS") visited the British Educational Center, they quickly learned that the British Educational Center did not exist: the British Educational Center was not listed on the Complex's exterior sign, the suite purportedly occupied by the British Educational Center was locked, the lights were shut off, and there was nothing side the Suite except for a small table. *Id*. And when USCIS reached out to Shushlebin so that he could show them the British Educational Center, he was conveniently "on vacation" and none of his "workers" were able to meet at the British Educational Center. *Id*. Shushlebin also could not answer basic questions about his business: he did not know the names of his employees, their phone numbers, or who was currently working at the British Educational Center. *Id*.

Shushlebin's criminal past is not limited to fraud. Indeed, according to Shushlebin's alien file, in 2017, Shushlebin was also the recipient of a mail parcel from the Netherland containing Sibutramine, a DEA Schedule IV controlled substance. *Id*. at 50.

Nor is there anything in Shushlebin's background that would mitigate, excuse, or explain his conduct. To the contrary, counsel concedes that Shushlebin grew up in a "loving and supportive home," and "his family life is notable for its stability and absence of trauma." PSR at ¶ 28. Shushlebin is also highly educated, having received

two master's degrees in economic accounting and software development from Russian universities. *Id.* at ¶ 91. He is fluent in both Russian and English, has specialized expertise in software development. *Id.* at ¶¶ 92-93.

Put simply, the defendant has had every opportunity that life could have presented him, yet he resorted to a life of criminal conduct.

### C. The Court Should Send a Strong Message to Deter Similar Misconduct by Others and the Defendant

The requested Guidelines sentence will afford adequate deterrence and protect the public from future crimes committed by Shushlebin. *See* § 3553(a)(2)(B), (C). This Court can and must send a message to both Shushlebin and would-be perpetrators of this crime, as well as to the public, that those who commit fraud sophisticated, hard-to-detect financial crimes, such as synthetic identity fraud schemes, will face significant prison time. *See United States v. Howard*, 28 F.4th 180, 208 (11th Cir. 2022) ("[G]eneral deterrence is a critical factor that must be considered and should play a role in sentencing the defendant.").

As to specific deterrence, Shushlebin is a habitual fraudster who will resume his criminal activity absent a severe consequence. Given his educational and work background (*i.e.*, economic accounting, website design, and expertise in software development) and his extensive foreign ties, a lengthy sentence is warranted to deter the defendant from making a professional career out of online, international scams.

As to general deterrence, synthetic identity fraud is one of the fastest-growing forms of financial crime, resulting in enormous global losses. Shushlebin must be

held accountable in a manner that will deter the growth of such schemes. *See*, *e.g.*, *United States v. Hoffman*, 901 F.3d 523, 556 (5th Cir. 2018) (noting that "scholars believe there is a greater connection in white collar cases between sentencing and future as financial crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity") (internal quotation marks omitted); *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("Deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes. . . . General deterrence comes from a probability of conviction and significant consequences.").

Unlike traditional identity theft, there is no real person to immediately notice or report the fraud, allowing the scheme to go undetected for long periods. Synthetic identities, by their very nature, are designed to bypass traditional identity verification checks because they blend real data with fabricated information that appears legitimate to most systems. And as Victim 1 explained in its Victim Statement, "synthetic identity fraud is among the hardest frauds to detect, because no real consumer is there to report it. Defendant knowingly engineered his scheme around this vulnerability."

As is the case here, financial institutions and businesses are the primary victims, with estimated losses in the tens of billions of dollars annually.

**D. <u>The Need to Avoid Unwarranted Sentencing Disparities</u>**

That leads to the last salient consideration: "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). For his offenses, Shushlebin faces

a maximum term of imprisonment of more than 30 years in prison—five years for Count One, 20 years for Count Two, five years per count for Count Three, and a mandatory minimum of two years for Count Four. A guidelines sentence is far below the potential statutory maximum. It is also in line with sentences upheld by the Eleventh Circuit on similar charges. *See e.g.*, *United States v. Wilmore*, 625 F. App'x 366, 368 (11th Cir. 2015) (upholding 240 months' imprisonment for convictions for conspiracy, wire fraud, and aggravated identity theft, arguing sufficient evidence did not support the convictions); *United States v. Rodriguez*, 443 F. App'x 504, 510 (11th Cir. 2011) (upholding sentence of 132 months for aggravated identity theft and conspiracy to commit fraud in connection with computers and aggravated identity theft). Thus, a term of imprisonment at the high end of Shushlebin's guidelines range is sufficient, but not greater than necessary to serve the purposes set forth in 18 U.S.C. § 3553(a).

## CONCLUSION

For all the reasons above, the United States seeks a meaningful sentence of incarceration, within the guideline range. Shushlebin's crime was deliberate and calculated. And most fundamentally, it caused significant harm to multiple victims. The government also respectfully requests the entry of restitution and forfeiture orders.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By: */s/ Lindsey Schmidt*
Lindsey Schmidt
Assistant United States Attorney
United States Attorney No. 222
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: lindsey.schmidt@usdoj.gov

*/s/ Edward P. Sullivan*
Edward P. Sullivan
Acting Chief, Public Integrity Section
U.S. Department of Justice
1301 New York Ave., NW, 10th Floor
Washington, DC 20530
Telephone: (202) 514-1412
E-mail: edward.sullivan@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Counsel of Record

By: *_/s/ Lindsey Schmidt_*

Lindsey Schmidt
Assistant United States Attorney
United States Attorney No. 222
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: lindsey.schmidt@usdoj.gov